IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NATHANIEL MAYBIN,                       :
    Plaintiff,                          :         CIVIL ACTION
                                        :         No. 16-1394
    v.                                  :
                                        :
DETECTIVE DENNIS                        :
SLOBODIAN, et al.,                      :
    Defendants.                         :

September 28, 2017                                          Anita B. Brody, J.

## MEMORANDUM

Plaintiff Nathaniel Maybin alleges that Defendants, Philadelphia Police Detectives Dennis Slobodian and Francesco Campbell, violated his Fourth and Fourteenth Amendment rights when they wrongfully arrested him, maliciously initiated criminal prosecution against him, and conspired to commit both violations. Plaintiff also alleges punitive damages. I exercise jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1441 because Maybin alleges that Defendants violated his civil rights under 42 U.S.C. § 1983 and the United States Constitution. Defendants filed a Motion for Summary Judgment.[1] ECF No. 18. For the reasons stated below, I will grant Defendants' motion.

**I.    BACKGROUND**

On February 20, 2014, a man named David Woods was brutally assaulted outside a deli

---

[1] Maybin's Complaint alleged six counts and named five different Defendants, however, Defendants' motion and this opinion address only Counts I, II, and IV as to Defendants Slobodian and Campbell. Maybin originally named Philadelphia Police Officers Julius R. Caesar and Charles Vallette, as well as the City of Philadelphia as Defendants. On June 28, 2016, I issued an order dismissing the City of Philadelphia as a defendant, therefore, Count V, which alleged failure to train by the City of Philadelphia, is dismissed. Maybin has withdrawn his claims against Officers Caesar and Vallette. Thus, Count III, which alleged malicious prosecution and wrongful arrest against Officers Caesar and Vallette, is withdrawn. Count IV, which was brought against all named Defendants, remains active only as to Detectives Slobodian and Campbell.

1

located at the intersection of 49th Street and Lancaster Avenue in Philadelphia. The assailant fled on foot and was chased for several blocks by Woods' companion, Bernard Williams. Detective Slobodian was assigned as the lead investigator on the case. Detective Slobodian received surveillance footage of the assault as well as a cell phone recovered from the scene. Detective Campbell, who had been assigned to assist Detective Slobodian, conducted a "Clear"[2] check on the cell phone that showed the name of the phone's subscriber as "Maybin, N." A Department of Motor Vehicles and Criminal History check for "Maybin, N." first returned a driver's license entry for Nathaniel Maybin Sr., Plaintiff's father ("Maybin Senior"). However, because the offender had been "described as thinner and younger" the Detectives continued to search the databases. *See* Defs.' Mem. Supp. Summ. J., Ex. A at 22, ECF No. 21. The subsequent search returned Plaintiff Nathaniel Maybin, a black male, 28 years old, 6 feet 3 inches in height. Maybin's driver's license photo depicted him wearing "what appeared to be an okie green military style jacket." *Id.* This jacket appeared similar to the description of the assailant's jacket that was provided by Williams to a police officer on the date of the assault. Based on these results, Detective Slobodian considered Maybin to be a suspect.

On February 23, 2014, Detectives Slobodian and Campbell interviewed Williams and Williams' wife, Victoria Carestio, who had also been in the general vicinity of the assault and witnessed Williams chasing the assailant. Williams described the assailant as "black . . . like a Carmel color[,] scruffy beard[,] 6'1["] and a green jacket." Defs.' Mem. Supp. Summ. J., Ex. D at D15, ECF No. 21. Williams also stated that the assailant had dropped his cell phone and indicated that he believed this to be the cell phone that was recovered after the assault. Detective Slobodian then showed Williams a photo array that included photos of Maybin and seven other

---

[2] Clear is a system used by officers to look up subscribers of phone numbers. *See* Defs.' Mem. Supp. Summ. J., Ex. M at 66-65, ECF No. 21.

2

black males.  Maybin's photo was placed in the top left position.³  When Detective Slobodian presented Williams with the photo array, Williams identified Maybin as the assailant.

Detective Campbell interviewed Carestio.  Carestio's description of the assailant differed from Williams' description.  She described the assailant as "25-30 [years old], black male, light skin, 5'7" [in height], medium build, camouflage solid green coat, cream colored pants, afro style hair light brown, no facial hair."  Defs.' Mem. Supp. Summ. J., Ex. E at D18, ECF No. 21.  Detective Campbell presented Carestio with the same photo array that Detective Slobodian had shown to Williams.  Carestio also identified Maybin as the assailant.

Detective Slobodian then secured a search warrant for Maybin's home.  On February 24, 2014 at 8:20 a.m., he and other officers conducted the search.  The search did not return any physical evidence tying Maybin to the assault.  Afterwards, Detective Slobodian prepared an affidavit of probable cause for Maybin's arrest.  Pl.'s Resp. to Defs.' Mot. Summ. J., Ex. G at D9-D10, ECF No. 19.  In his affidavit, Detective Slobodian cited the two witness identifications, the recovered cell phone, and the similarity between the green jacket worn by Maybin in his DMV photo and the jacket worn by the assailant, as described by Williams and Carestio.  *Id*.  Detective Slobodian's affidavit did not include any information about the search of Maybin's home, the discrepancies in the eyewitness' accounts, or that a search of "Maybin, N." first returned the suspect's father.  A magistrate of the Philadelphia Municipal Court issued the arrest warrant.

On the afternoon of February 24, 2014—hours after the arrest warrant was issued—Maybin Senior, was interviewed by a Detective Brady at the Southwest Detectives Division

---

³ Maybin contends that the photo does not accurately depict his complexion. In the photo array, Maybin argues that his photo is "washed out" and his skin tone appears significantly lighter than all but one of the seven other individuals depicted.

headquarters regarding the cell phone recovered from the crime scene.[4] Maybin Senior stated that he thought he had lost his cell phone on February 20, 2014 outside the deli located at 49th Street and Lancaster Avenue. He had stopped at the deli after going to "the Eagles Check cashing place." Defs.' Mem. Supp. Summ. J., Ex. G at D35, ECF No. 21. He accurately described the cell phone recovered at the crime scene and provided the correct phone number. Maybin Senior said that he had went back to the deli to look for the phone an hour after he thought he had lost it.

Detective Brady then went to the deli located at 49th Street and Lancaster Avenue and interviewed an employee, Jennifer Hung. Hung stated that on February 21, 2014, the day after the assault, an older black male had come into the store and asked about a lost cell phone.[5] She said that "[w]e can give you a photo of male." Defs.' Mem. Supp. Summ. J., Ex. I at D30, ECF No. 21. Detective Brady then relayed the content of these interviews to Detective Slobodian. Detective Brady and Detective Slobodian discussed Maybin Senior's credibility and concluded he was lying. Maybin Senior had stated that he went to Eagle Check Cashing to buy lottery tickets but was not able to, which is why he went to the deli. *Id.*, Ex. A at 35-36. However, Slobodian said that he knew that Eagle Check Cashing *did* have lottery tickets, which meant Maybin Senior's story "didn't add up." *Id*. at 36. Notably, the record of Maybin Senior's interview made no mention of lottery tickets. *Id*. Regardless, the Detectives did nothing further with the information from Maybin Senior and Hung because of the credibility determination.

On February 25, 2014, upon learning that there was an outstanding warrant for his arrest,

---

[4] Maybin Senior came into the headquarters because he was alerted by his son's mother of the execution of the search warrant, which occurred at her home. Defs' Mem. Supp. Summ. J., Ex. M at 84-85, ECF No. 21. Maybin Senior then learned that the police had possession of what he claimed to be his phone. *Id*.

[5] This is a discrepancy compared to Maybin Senior's statement in which he went to look for the phone on February 20, 2014.

Maybin surrendered himself at the Philadelphia Police Department 18th District headquarters. The Philadelphia District Attorney's Office later filed charges against Maybin for attempted murder, aggravated assault, simple assault, recklessly endangering another person, and possession of an instrument of crime.

I have summarized the events leading to Maybin's arrest:

- February 20 – David Woods is assaulted outside the deli at 49th Street and Lancaster Avenue.

- February 21 – Detectives were given the cell phone and a video of the assault.

- February 23 – Detectives connected Maybin to the cell phone by first searching for the subscriber of the number, and then searching for "Maybin, N."

- February 23 – Detectives interviewed Williams and Carestio, who were eyewitnesses to the assault. Williams stated that the assailant dropped a cell phone, and both witnesses positively identified Maybin in a photo array.

- February 24 at 8:20 a.m. – Officers executed a search warrant at Maybin's address. The search did not return any evidence.

- February 24 at 1:38 p.m. – The arrest warrant for Maybin is signed. *See* Defs.' Mem. Supp. Summ. J., Ex. F at D8, ECF No. 21. The warrant was based on the sworn affidavit submitted by Detective Slobodian.

- February 24 at 4:20 p.m. – Maybin Senior arrives at the police station and is interviewed about his claim that he lost his cell phone near the deli on February 20.

- February 24 at 5:00 p.m. – Hung is interviewed about Maybin Senior's account of losing his cell phone.

- February 25 – Maybin turns himself in after learning of the arrest warrant.

Maybin remained continuously incarcerated for the next seventeen months. On July 23, 2015, Maybin was found not guilty on all charges in a bench trial in the Philadelphia Court of Common Pleas. During the trial, Maybin introduced alibi evidence that included witness testimony and a supporting surveillance video. The video showed Maybin at a Chinese restaurant in southwest Philadelphia, located forty-five minutes to an hour from the scene of the assault. The video placed Maybin at the restaurant until 3:54 p.m., only minutes before the assault occurred at approximately 4:00 p.m. On August 4, 2015, Maybin was released from custody.

## II. LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.* In ruling on a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In essence, the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III. DISCUSSION

Maybin alleges false arrest and malicious prosecution by Defendants, as well as conspiracy to commit malicious prosecution and false arrest. Defendants argue that Maybin's false arrest claims fail as a matter of law because they had probable cause when issuing a warrant

for Maybin's arrest. They argue that Maybin's malicious prosecution claims fail because there is insufficient evidence to show that Defendants, as police officers, "initiated" the prosecution of Maybin or interfered with the prosecutor's decision to do so. The Defendants also argue that qualified immunity protects them from both the false arrest and malicious prosecution claims. Defendants assert that Maybin's conspiracy claim is insufficient because of a failure to prove the underlying claims. Because the qualified immunity standard encompasses whether Maybin's constitutional claims would be successful, I will first focus the discussion on that standard.

### A. Qualified Immunity Standard

Defendants, as law enforcement officers, have asserted qualified immunity. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In asserting qualified immunity, the burden is on the government officials. *Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010) (citing *Harlow*, 457 U.S. at 808). The Supreme Court has established a two part test to determine qualified immunity. *See* Saucier v. Katz, 533 U.S. 194, 201-02 (2001). First, courts ask whether the facts—taken in a light most favorable to the party asserting injury—show that the officer's conduct violated a constitutional right. *Reedy*, 615 F.3d at 223 (quoting *Saucier*, 533 U.S. at 201). If the facts do not show a violation, then the inquiry ends, and qualified immunity is established. *See Id.* at 223-24. If the facts do show a violation, then an officer is still entitled to qualified immunity unless the right was clearly established at the time of the conduct. *Id*. A right is clearly established if a reasonable officer would know that his conduct was unlawful "in the

7

situation he confronted." *Id.* at 224 (citing *Saucier*, 533 U.S. at 202). Whether there was a violation of a constitutional right or whether that right was clearly established can be determined in any order depending on the circumstances of the case at hand. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### B. False Arrest

Maybin alleges Fourth Amendment false arrest claims against Detectives Slobodian and Campbell. Whether or not Maybin's arrest was supported by probable cause is the essential question for the false arrest claims. *See Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) ("To prevail on their false arrest claim, plaintiffs would have to demonstrate at trial that the police lacked probable cause to arrest . . . ."); *Dowling v. City of Philadelphia*, 855 F.2d 136, 142 (3d Cir. 1988) (holding that the plaintiff had failed to establish "the existence of an "element essential" to her false arrest claim where she could not show "that her arrest was not premised upon" probable cause).

Probable cause exists "when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. New Jersey*, 71 F.3d 480, 483 (3d Cir. 1995). "[I]t does not 'require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'" *Reedy*, 615 F.3d at 211 (quoting *Adams v. Williams,* 407 U.S. 143, 149 (1972)). In assessing the existence of probable cause, courts look to the totality of the circumstances. *United States v. Glasser*, 750 F.2d 1197, 1205 (3d Cir. 1984).

Maybin was arrested pursuant to a warrant. Standing alone, the facts alleged in the affidavit used to secure that warrant establish probable cause. Detective Slobodian's affidavit

relied on three strong pieces of evidence: (1) the photo array identifications of Maybin made by eyewitnesses Williams and Carestio; (2) the cell phone recovered from the scene, registered to "Maybin, N.," and the fact that Williams saw the assailant drop a cell phone; and (3) the similarity of the green jacket worn by Maybin in his driver's license photo to the jacket worn by the assailant.

Maybin's argument that probable cause did not exist rests on a claim that Detective Slobodian did not present all of the facts in his affidavit. Maybin argues that if all of the facts were included in the affidavit, then it would not have supported probable cause. He points to two categories of exculpatory facts absent from the signed affidavit: (1) exculpatory facts that were known to the detectives prior to the issuance of the warrant, and (2) exculpatory facts that were first presented to the detectives after the issuance of the warrant but before Maybin's arrest. As discussed below, facts known to the detectives prior to signing the affidavit can be considered, but facts learned only after the affidavit was issued cannot be considered. Ultimately, the added facts do not provide enough evidence to eliminate probable cause, and Maybin's false arrest claims fail.

### a. Exculpatory Facts that Were Known to the Detectives Prior to the Issuance of the Warrant

In recent years, the Third Circuit has provided substantial clarification in cases, such as this one, where probable cause is challenged despite the existence of a warrant.

> [A]n arrest warrant issued by a magistrate or judge does not, in itself, shelter an officer from liability for false arrest. Rather, a plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause.

9

*Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000) (internal quotation marks and citations omitted). "[O]missions are made with reckless disregard if an officer withholds a fact in his ken that '[a]ny reasonable person would have known . . . was the kind of thing the judge would wish to know.'" *Id.* at 788 (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)). Thus, when preparing the affidavit, "the officer is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 469 (3d Cir. 2016) (internal quotation marks omitted).

After determining which omissions were made with reckless disregard, a court then adds those facts to a reconstructed affidavit to determine if the omissions were material to the finding of probable cause. *See Dempsey*, 834 F.3d at 474. The effect of any omissions on probable cause is assessed *on the whole*. *See Andrews v. Scuilli*, 853 F.3d 690, 703 n.16 (3d Cir. 2017) (stating that "there may be instances when no single omission or misrepresentation is sufficient to defeat a finding of probable cause, but the combined effect of the omissions and misrepresentations" could be sufficient). Courts should also add in any information that "gives context to or affects the weight to be accorded the recklessly omitted information." *Dempsey*, 834 F.3d at 474. If the reconstructed affidavit still supports a finding of probable cause, then the omissions were immaterial and a false arrest has not occurred. *Cf. Andrews*, 853 F.3d at 705.

In this case, the affidavit omitted three relevant exculpatory facts that were known to the Defendants when the affidavit was signed: (1) the search of Maybin's home that which returned no additional evidence connecting Maybin to the assault; (2) portions of Carestio's description of the assailant that conflicted with William's description of the

assailant and clearly did not match Maybin's appearance; and (3) facts that weaken the connection between Maybin and the cell phone that include the degree of certainty that the offender dropped a cell phone and Maybin Senior's name coming up first after a search for "Maybin, N." These omissions were relevant to probable cause and will be added to the reconstructed affidavit to determine if they are material to probable cause.

### i. The Search of Maybin's Home

The affidavit includes no mention of the search of Maybin's home that Detective Slobodian and other officers conducted earlier on the same day the affidavit was submitted. The search returned no physical evidence connecting Maybin to the assault. The facts of the search and its result, while not independently exculpatory, are relevant to the assessment of probable cause. The search was the officers' best opportunity to obtain additional physical evidence that could further connect Maybin to the assault, and it produced none. The lack of evidence produced by a search is not inconsistent with probable cause, but it is relevant in the probable cause analysis. *See United States v. Frost*, 999 F.2d 737, 743-44 (3d Cir. 1993) (discussing an affidavit that omitted a drug dog failing to alert to a suspect's suitcase).

### ii. Carestio's Description of the Assailant

The affidavit also excluded relevant portions of Carestio's interview. In her interview, Carestio described the assailant as follows: "25-30 [years old], black male, light skin, 5'7" [in height], medium build, camouflage solid green coat, cream colored pants, afro style hair light brown, no facial hair." Defs.' Mem. Supp. Summ. J., Ex. E at D18, ECF No. 21. In relevant part, Detective Slobodian's affidavit states that Carestio "described the jacket being worn by the Offender as a camouflage solid colored green

(commonly called OD green) along with cream colored pants." Pl.'s Resp. to Defs.' Mot. Summ. J., Ex. G at D10, ECF No. 19. The affidavit omits descriptors such as "light skin," "5'7" [in height]," and "no facial hair"—descriptors that do not match Maybin's physical characteristics. Even though Carestio selected Maybin's photo from the photo array, her description of the assailant's height, skin tone, and facial hair could be the kind of "glaring discrepancies in a witness' testimony [that] can undermine the reliability of an eyewitness who provides a positive identification." *See Andrews*, 853 F.3d at 702.

In addition, some of the omitted descriptors also conflict with the physical description of the assailant provided by Williams. For example, Williams estimated the assailant's height to be six feet one inch, an estimate much closer to the height of six feet three inches that is listed in Maybin's DMV record. Both Maybin's DMV recorded height and Williams' estimate of the assailant's height were included in the affidavit of probable cause; Carestio's estimate of the assailant's height was not. The discrepancies are relevant and should have been disclosed to the magistrate.

                **iii.**       **William's Statement and the Search of "Maybin, N."**

The affidavit overstates the certainty of the connection of Maybin to the cell phone recovered from the scene of the assault. In his statement to police, Williams said that the offender "dropped his cell phone." That statement is the evidence Detective Slobodian used to link the found cell phone with the offender. Thus, he overstates his certainty when he says in his affidavit that the cell phone was recovered from the scene, and it was "later learned to have been dropped by the Offender." Defs.' Mem. Supp. Summ. J., Ex. F at D9, ECF No. 21. Detective Slobodian should have indicted the source

12

of the information.

The affidavit is also misleading when discussing how Maybin was linked to the phone. In his deposition, Detective Slobodian states when he first searched "Maybin, N.," the system returned Maybin Senior. Defs.' Mem. Supp. Summ. J., Ex. A at 22, ECF No. 21. Detective Slobodian continued to search because Maybin Senior, who is "older" and "heavier," did not match the description of the offender provided by the witnesses. *See id*. The affidavit, however, simply states that a BMV and Criminal History check on "Maybin, N." "showed" Plaintiff as a suspect. *See* Defs.' Mem. Supp. Summ. J., Ex. F at D9, ECF No. 21. Detective Slobodian should have indicated that the search returned another person but that Maybin was selected as the suspect because the other person's picture did not match the eye witnesses' descriptions of the assailant.

### b. Exculpatory Facts that Were First Presented to the Detectives After the Issuance of the Warrant

Once an affidavit is sworn, however, officers do not have a duty to present new exculpatory facts. *Dempsey*, 834 F.3d at 480. In *Dempsey*, the Third Circuit laid down a bright-line rule that statements received after an affidavit for probable cause is sworn cannot be considered when reconstructing an affidavit. *Id.* The court stated that it must "examine only the information available to the officer at the time of the swearing of the affidavit of probable cause. After-acquired evidence, however significant for trial, does not inform an officer's knowledge or good faith . . . ." *Id.*; *accord Safar v. Tingle*, 859 F.3d 241, 247 (4th Cir. 2017) ("[W]e are unaware of a nebulous duty requiring police officers to follow some undefined procedure whenever they come across further information that casts doubt on an active arrest warrant."). *But see United States v. Marin-Buitrago*, 734 F.2d 889, 894 (2d Cir. 1984) (determining that

13

officers have a duty to inform a magistrate of material changes in the facts upon which a search warrant was originally issued). Hence, an officer in this Circuit that has already signed a sworn affidavit and presented it does not have a duty to alert a magistrate to any intervening exculpatory facts material to probable cause.[6]

In this case, the information gleaned from Detective Brady's interviews with Maybin Senior and Hung regarding the cell phone, while relevant and exculpatory,[7] cannot be considered. The cell phone information was not known by Detective Slobodian at the time he submitted the sworn affidavit on February 24, 2014. *See Dempsey*, 834 F.3d at 480.

### c. The Reconstructed Probable Cause Affidavit

I will now reconstruct the affidavit to include the relevant omitted information described above.

> On 2/20/14 at approximately 4:50 PM 16th District Officers were called to Presby Hospital at 3800 Powelton [A]ve for a report of an assault. Upon the arrive of Officer Whitemore #4008 he met with the Witness (BW). The Witness stated that he and the Complainant (DW) were at 49th and Lancaster [A]ve going to the store. The Witness left the store prior to the Complainant and got back in their work truck. The Witness then heard the noise of someone falling to the ground and believed it was the Complainant slipping on ice. When he exited his car he observed the Offender standing over the top of the Complainant holding a hammer. The Witness observed blood on the ground and

---

[6] The apparent categorical nature of this rule, as it is laid out in *Dempsey*, could lead to instances of manifest injustice. Suppose that, following a murder, police identify a suspect. Multiple eyewitnesses provide physical descriptions of the murderer, all of which closely match the suspect's features. Police later search the suspect's home and discover clothing that closely matches the clothes worn by the murderer, as described by each eyewitness. These facts, on their own, undoubtedly establish probable cause for the suspect's arrest, and it is difficult to imagine even the most skeptical magistrate denying a warrant application supported by these facts.
    Now suppose that five minutes after the police secure a warrant for the suspect's arrest, a different individual walks into the police station, confesses to the murder, and presents the murder weapon. This individual's physical features and clothes also closely match the descriptions provided by the eyewitnesses. This intervening event could destroy the probable cause that previously supported the warrant for the initial suspect's arrest. Were the police to make a supplemental presentation of the intervening information to the issuing magistrate, the magistrate could have grounds to rescind the warrant.
    Thus, a categorical rule destroying the constitutional significance of such intervening facts arguably impinges on the "right to be free from arrest except on probable cause." *Andrews*, 853 F.3d at 705 (quoting *Orsatti*, 71 F.3d at 483).

[7] The cell phone was a key piece of evidence that connected Maybin to the scene of the assault, and Maybin Senior's statement to Detective Brady— corroborated by Hung—provided a coherent explanation of the cell phone's origin that cast doubt upon the link between Maybin and the crime scene.

14

Complainant. The Witness got a bar from the trick and chased after the Offender for approximately two blocks prior to losing him around Master and Lancaster. The Witness went back to the location of occurrence and found the Complainant bleeding heavily and unresponsive. The Witness drove the Complainant to Presby Hospital where he was later transferred to HUP due to the trauma to his head.

….[8]

On or about 2/21/14 Detectives were provided a copy of the video which showed the incident along with a cell phone which ~~was later learned to have bene dropped by the Offender~~ **the Witness stated had been dropped by the Offender**.

The Affiant reviewed the video which showed the Complainant walking toward his truck which was parked on the 4900 block of Lancaster Ave. The Complainant is then approached by a black male who was wearing what appeared to be a green jacket. The [Offender] then hit the [C]omplainant on his left temple with what appeared to be a hammer. The Complainant immediately falls to the ground. At this time a male identified as the Witness exits from the truck and runs toward the Offender. The [O]ffender comes back at the Witness so he retreats to the back of the truck. The Offender then strikes the Complainant in his rib cage area with the object believed to be a hammer and then kicks him two more times prior to fleeing west on Lancaster [A]ve. The Complainant is observed staggering back to his truck.

On 2/23/14 the Affiant was able to retrieve the assigned phone number (215-254-4681) to the phone which was recovered from the scene at 49th and Lancaster [A]ve. Based on the recovered information Detective Campbell was able to conduct a "Clear" check on the phone which showed a subscriber of Maybin, N. This name did not meet [sic] match the Complainant's information which lead [sic] the Affiant to believe it belonged to the Offender. The Affiant along with Detective Campbell #724 conducted a BMV and Criminal History check on the name which **first** showed **Nathaniel Maybin, Sr., a heavier, older man than described by witnesses. A further search of the name returned** a suspect of Nathaniel Maybin, **Jr.** B/M/28 6'3", [REDACTED] which was validated on 2/5/13 to an address of [REDACTED]. Based on the fact[s] of this case the Offender was randomly place[d] in a photograph array which consisted of 7 additional black males.

On 2/23/14 the Witness was interviewed inside Southwest Detectives by the Affiant. The Witness provided the above mentioned facts in reference to the Complainant being assaulted. The Witness further stated that when the Offender was fleeing he dropped the phone which the Affiant currently possessed. The Witness was shown the video and identified himself during the course of the incident. The Witness stated that he chased the Offender for approximately two minutes west on Lancaster Ave passing his Wife (Witness #2) who was out front their residence. The Witness stated he would be able to

---

[8] For brevity's sake, I omit a paragraph describing the victim's injuries. This paragraph has no bearing on probable cause, other than to confirm that the victim was unable to communicate with investigating officers in any way, due to the extreme nature of his injuries.

15

identify the Offender who was described as a black male[,] **"like a Carmel color,"** scruffy beard[,] approximately 6'1", wearing a green jacket.  The Witness was shown the photograph array which consisted of eight black males[,] the suspect (who matched the description) being randomly placed in the #1 position.  The Witness positively identified the Offender as the one he observed standing over the Complainant with the hammer.  The Witness signed the array along with his interview in the presence of the Affiant, Detective Brady, and Lt. Massaquoi.

On 2/23/14 Witness #2 was interviewed inside Southwest Detectives by Detective Campbell #724.  The Witness stated she observed her husband (Witness #1) chasing the Offender down Lancaster Ave approaching their residence.  The Witness described ~~the jacket being worn by the Offender was a camouflage solid colored green (commonly called OD green) along with cream colored pants~~ **the assailant as "25-30 [years old], black male, light skin, 5'7", medium build, camouflage solid green coat, cream colored pants, afro style hair light brown, no facial hair."**  The Witness said that while this male was fleeing from her husband he came within 2 ½ feet from her.  The Witness was shown a photograph array which consisted of eight black males[,] the suspect randomly placed in the #1 position.  The Witness positively identified **the male in the #1 position as** the male that she observed fleeing from her husband (Witness #1).

The Affiant reviewed the associated BMV photograph of the Offender which was taken on 2/5/14.  It appears that the jacket being worn during this photograph is a OD green army style jacket which was described by Witnesses.

**On 2/24/14 the Affiant and other officers conducted a search of the Suspect's home, pursuant to a warrant.  The search returned no additional evidence.**

In reviewing this reconstructed affidavit, there is still a clear basis for probable cause established by the two eyewitness identifications.  While such identifications can be rife with problems,[9] they provide probable cause in this case.  Carestio's complete description of the assailant calls into question the reliability of the eyewitness identifications of Maybin in the photo array, but it does not undermine them completely.  Some unreliability is not fatal to a probable cause determination. *Dempsey*, 834 F.3d at 478. In *Wilson*, the Third Circuit found a photo array identification to show probable cause even when other evidence suggested a significant height difference between the perpetrator and the arrestee, and a different victim did

---

[9]  For a discussion of scientific research regarding variables that impact the reliability of eyewitness identifications, *see generally Dennis v. Secretary, Pennsylvania Department of Corrections*, 834 F.3d 263, 320-32 (3d Cir. 2016) (McKee, J., concurring).

16

not identify the arrestee. *Wilson*, 212 F.3d at 791-92 ("The strongest inculpatory evidence is clearly the positive identification."). In this case, Williams and Carestio may have differed in their descriptions of the assailant, but they both independently identified Maybin in the photo array. The dual identification by eyewitnesses established probable cause. Further, the identifications are coupled with Maybin's connection to the found cell phone and the similarity of Maybin's jacket in his DMV photo to the jacket worn by the assailant.

The other omitted evidence cannot overcome a finding of probable cause. The absence of evidence found in the search of Maybin's home, the fact that the Detectives determined that the offender dropped a cell phone based on William's statement, and the search of "Maybin, N." that first returned Maybin Senior are not sufficient—when added to the other evidence—to eliminate probable cause. An eye witness saying a phone was dropped coupled with a phone being found at the crime scene is strong circumstantial evidence. Also, Maybin Senior's name coming up in a search is insufficient to weaken the circumstantial evidence tying the phone to Maybin, Jr., especially when that evidence was substantiated by the photo array identification of two eyewitnesses.

### 2. Conclusion

Defendants omitted from their probable cause affidavit the negative results of the search of Maybin's apartment, certain conflicting and potentially exculpatory statements made by one of the two eyewitnesses, and facts that attenuate the link between Maybin and the cell phone. Each of these omitted facts weakens a finding of probable cause, but taken together, their impact—when viewed in the light most favorable to Maybin—does not sufficiently impair the affidavit. Consequently, there is no violation for false arrest because "no reasonable jury could find that the reconstructed affidavit lacked probable cause." *Dempsey,* 834 F.3d at 481. Because

there is no constitutional violation, Defendants are entitled to qualified immunity on Maybin's claims for false arrest, therefore I will grant Defendant's motion for summary judgment.[10]

### C. Malicious Prosecution

To prevail in a malicious prosecution action under Section 1983:

> a plaintiff must show: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice, and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005). In this case, the first element—whether the defendants initiated a criminal proceeding—is dispositive, thus, I address that element only.

Defendants contend that they did not initiate prosecution against Maybin, and therefore, Maybin has not properly stated a malicious prosecution claim. They also argue qualified immunity. Because qualified immunity encompasses whether a constitutional violation occurred, an analysis of malicious prosecution under a qualified immunity analysis covers both of Defendants' arguments. Thus, I only will discuss whether a constitutional violation occurred.

Ordinarily, a prosecutor, not a police officer, is responsible for initiating criminal proceedings. "[A]n officer may, however, be considered to have initiated a criminal proceeding if he or she knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion." *Brockington v. City of Philadelphia,* 354 F.Supp.2d 563, 569 (E.D. Pa. 2005) (internal quotation marks omitted). Maybin contends that Defendants

---

[10] The inclusion of Detective Brady's interviews with Maybin Senior and Hung may have allowed a reasonable jury to determine a lack of probable cause. However, it would not have been clearly established law that Defendants had a duty to provide new exculpatory information after the arrest warrant was signed. *Cf. Dempsey*, 834 F.3d at 480. Thus, Defendants still would be entitled to qualified immunity even if a violation was found on that basis.

interfered with the prosecutor's independent judgment by withholding exculpatory evidence such as the results of the search of Maybin's home, Carestio's description of the assailant, and Maybin Senior's account of dropping his cell phone near the crime scene. He places particular weight in the withholding of exculpatory information from Detective Slobodian's affidavit of probable cause, as discussed above.

Defendants assert that—regardless of any omissions in the affidavit of probable cause supporting Maybin's arrest—they disclosed all information recovered during their investigation to the District Attorney's Office, prior to the filing of charges. The record supports Defendants' assertion. Detective Slobodian's investigation report notes that a search warrant was executed at Maybin's home on February 24. Defs.' Mem. Supp. Summ. J., Ex. J at 2, ECF No. 21. The report also notes that Maybin Senior provided a statement saying he dropped his cell phone at the location of the assault. *Id*. at 6. In his sworn declaration, Detective Slobodian attested that he "submitted all the documents and evidence that [he] had obtained in the investigation to the District Attorney's Office, including the deli surveillance video, the cell phone, all witness interviews and photo arrays." *Id.*, Ex. K at 1.

Maybin has not pointed to any evidence that contradicts Detective Slobodian's statement. Instead, his arguments return to the omissions in Detective Slobodian's affidavit of probable cause. In doing so, Maybin misunderstands the distinction between his two claims—between a decision to arrest and a decision to prosecute. Defendants obtained both inculpatory and exculpatory information during the course of their investigation. They withheld some material exculpatory information from the affidavit of probable cause supporting Maybin's arrest. But, following the omissions, they turned over their complete files, including the exculpatory information, to prosecutors in the District Attorney's Office. Those prosecutors then decided to

19

file criminal charges against Maybin. Based on that record, Maybin cannot successfully argue that Defendants interfered with the prosecutors' independent judgment to such a degree that Defendants "initiated" criminal proceedings against Maybin. Hence, there was no constitutional violation, and Defendants are entitled to qualified immunity. I will grant summary judgment on Maybin's malicious prosecution claims.

### D. Conspiracy

I will also grant Defendants' motion for summary judgment as to Maybin's claim for conspiracy to commit false arrest and malicious prosecution because for both underlying claims the officers are protected by qualified immunity. *See Ippolito v. Aherne*, No. CV 14-6077, 2015 WL 6447153, at *6 (E.D. Pa. Oct. 26, 2015) (citing *Downey v. Coalition Against Rape & Abuse*, 143 F. Supp. 2d 423, 452-53 (D. N.J. 2001)) ("An official who is immune from suit for a Section 1983 violation is also immune from liability . . . for a claim of conspiracy to commit the conduct that is the subject of the Section 1983 violation.").

### E. Punitive Damages

Plaintiff alleges punitive damages as Count VI. Because I have found that there are no constitutional violations based on Plaintiff's other claims, there cannot be a claim for punitive damages. *See Alexander v. Riga*, 208 F.3d 419, 430 (3d Cir. 2000) ("[P]unitive damages can be awarded in a civil rights case where a jury finds a constitutional violation.").

### IV. CONCLUSION

For the reasons stated above, I will grant Defendants' motion for summary judgment.

s/Anita B. Brody

_____
ANITA B. BRODY, J.

Copies VIA ECF on _____ to:   Copies MAILED on _____ to: